IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

DOUGLAS HORN,                    )
                                 )
          Plaintiff,             )
                                 )
     v.                          )     Case No.
                                 )     06-0152-CV-W-REL-SSA
JO ANNE BARNHART, Commissioner   )
of Social Security,              )
                                 )
          Defendant.             )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Douglas Horn seeks review of the final
decision of the Commissioner of Social Security denying
plaintiff's application for disability benefits under Title
II of the Social Security Act ("the Act"). Plaintiff argues
that the ALJ erred in failing to explain the weight given to
state agency medical consultants, and the ALJ failed to
fully and fairly develop the record. I find that the
substantial evidence in the record as a whole supports the
ALJ's finding that plaintiff is not disabled. Therefore,
plaintiff's motion for summary judgment will be denied and
the decision of the Commissioner will be affirmed.

## I.   BACKGROUND

On April 30, 2002, plaintiff applied for disability
benefits alleging that he had been disabled since July 9,
2001. Plaintiff's disability stems from depression,

33anxiety, and restrictive lung disease.  Plaintiff's
application was denied on August 14, 2002.  On September 2,
2004, a hearing was held before Administrative Law Judge
John Flanagan.  On November 26, 2004, the ALJ found that
plaintiff was not under a "disability" as defined in the
Act.  On January 19, 2006, after considering additional
evidence, the Appeals Council denied plaintiff's request for
review.  Therefore, the decision of the ALJ stands as the
final decision of the Commissioner.

## II.  *STANDARD FOR JUDICIAL REVIEW*

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides
for judicial review of a "final decision" of the
Commissioner.  The standard for judicial review by the
federal district court is whether the decision of the
Commissioner was supported by substantial evidence.  42
U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401
(1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir.
2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997);
Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The
determination of whether the Commissioner's decision is
supported by substantial evidence requires review of the
entire record, considering the evidence in support of and in
opposition to the Commissioner's decision.  Universal Camera

2

Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan,
876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also
take into consideration the weight of the evidence in the
record and apply a balancing test to evidence which is
contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th
Cir. 1998) (citing Steadman v. Securities & Exchange
Commission, 450 U.S. 91, 99 (1981)).

    Substantial evidence means "more than a mere scintilla.
It means such relevant evidence as a reasonable mind might
accept as adequate to support a conclusion."  Richardson v.
Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d
1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial
evidence standard presupposes a zone of choice within which
the decision makers can go either way, without interference
by the courts.  "[A]n administrative decision is not subject
to reversal merely because substantial evidence would have
supported an opposite decision."  Id.; Clarke v. Bowen, 843
F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

    An individual claiming disability benefits has the
burden of proving he is unable to return to past relevant
work by reason of a medically-determinable physical or
mental impairment which has lasted or can be expected to

3

last for a continuous period of not less than twelve months.
42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that
he is unable to return to past relevant work because of the
disability, the burden of persuasion shifts to the
Commissioner to establish that there is some other type of
substantial gainful activity in the national economy that
the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853,
857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974
(W.D. Mo. 2000).

The Social Security Administration has promulgated
detailed regulations setting out a sequential evaluation
process to determine whether a claimant is disabled. These
regulations are codified at 20 C.F.R. §§ 404.1501, et seq.
The five-step sequential evaluation process used by the
Commissioner is outlined in 20 C.F.R. § 404.1520 and is
summarized as follows:

     1.   Is the claimant performing substantial gainful
activity?

               Yes = not disabled.
               No = go to next step.

     2.   Does the claimant have a severe impairment or a
combination of impairments which significantly limits his
ability to do basic work activities?

               No = not disabled.
               Yes = go to next step.

4

3.   Does the impairment meet or equal a listed impairment in Appendix 1?

>        Yes = disabled.
>        No = go to next step.

4.   Does the impairment prevent the claimant from doing past relevant work?

>        No = not disabled.
>        Yes =  go to next step where burden shifts to Commissioner.

5.   Does the impairment prevent the claimant from doing any other work?

>        Yes = disabled.
>        No = not disabled.

## IV.  THE RECORD

The record consists of the testimony of plaintiff and vocational expert Janice Hastert, in addition to documentary evidence admitted at the hearing.

## A.   ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### Earnings Record

The record establishes that plaintiff earned the following income from 1980 through 2004:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1980 | $   312.58 | 1993 | $ 2,699.78 |
| 1981 | 1,518.42 | 1994 | 7,006.94 |

5

| | | | |
|---|---|---|---|
| 1982 | 1,774.62 | 1995 | 4,969.68 |
| 1983 | 1,259.41 | 1996 | 9,405.05 |
| 1984 | 0.00 | 1997 | 15,132.90 |
| 1985 | 4,518.00 | 1998 | 6,568.79 |
| 1986 | 3,750.05 | 1999 | 0.00 |
| 1987 | 4,634.59 | 2000 | 6,606.21 |
| 1988 | 2,137.91 | 2001 | 9,784.03 |
| 1989 | 4,913.48 | 2002 | 2,529.68 |
| 1990 | 9,936.93 | 2003 | 8,637.70 |
| 1991 | 13,373.31 | 2004 | 0.00 |
| 1992 | 15,072.20 | | |

(Tr. at 56).

Although plaintiff's earnings record shows $0.00 earned income for 2004, the record contains earnings statements from U.S. Toy Company, Inc., dated June 4, 2004; June 18, 2004; July 2, 2004; July 16, 2004; July 30, 2004; August 13, 2004; and August 27, 2004 (Tr. at 57-63). This shows that plaintiff's year-to-date earnings with U.S. Toy were $5,381.48 as of August 27, 2004.

**Disability Report**

On January 8, 2002, plaintiff completed a Disability Report (Tr. at 64-73). Plaintiff stated that he was unable to work because he could not handle full time work, could not handle stress, is overcome with anxiety and is unable to

6

stay focused (Tr. at 65). Plaintiff stated that he was off
work from December 1998 until June 2000 due to an auto
accident. When he returned to work, he could only work part
time.

**Claimant Questionnaire**

On January 8, 2002, plaintiff completed a Claimant
Questionnaire (Tr. at 74-77). He reported that he has no
difficulties preparing meals, he goes grocery shopping with
no assistance, he cleans and does simple repairs around the
house, he needs no help in completing chores, he does car
maintenance and gardening, he has no difficulty driving, and
he has no problems managing money. Plaintiff goes out three
to four times a week to visit his parents or go to the store
and is gone for several hours.

**Third Party Daily Activities Questionnaire**

On March 17, 2002, plaintiff's mother, Loretta Horn,
completed a Daily Activities Questionnaire (Tr. at 86-89).
She reported that plaintiff is always late. He has no
difficulties taking care of his personal needs, he prepares
and cooks his own meals, he does his own grocery shopping,
he does his own laundry, he cleans his own house, and he
does maintenance. Mrs. Horn stated that plaintiff's father
"has ben paying his bills. His father has chronic

7

bronchitis and other health problems. Doug's bills have been draining us financially."

She reported that plaintiff's hobbies include watching television and trying to invent things. She said that he has started many projects and not finished them. She also wrote, "Doug does not always seem to be in a reality world. He never seem[s] to think of the future. We will not always be around to help him out."

**Third Party Daily Activities Questionnaire**

On March 17, 2002, plaintiff's father, Alfred Horn, completed a Daily Activities Questionnaire (Tr. at 90-93). He reported that plaintiff lives alone in his own home, he does household chores, and he works on "do it yourself" projects. He reported that when employed, plaintiff prefers the evening shift, and then he sleeps in the early part of the day. Mr. Horn reported that plaintiff has no difficulty taking care of his personal needs, he does his own cooking, he does his own shopping, he manages his own finances (although his parents help provide the money to pay his bills). He stated that plaintiff does all of his own household chores with no assistance, he works in the yard and restores cars. He has a few friends he spends time with, and he visits his parents once or twice a week. He

8

stated that plaintiff will continue and finish a job "of his selection and as long as it maintains his interest."

Mr. Horn concluded the form with the following, "Doug is very talented when working in an isolated situation but has difficulty working in groups and taking instructions from a group leader. He would be very productive if left to his own resources."

## B. *SUMMARY OF MEDICAL RECORDS*

On January 25, 1999, plaintiff saw Jeffrey Scott, M.D., for an orthopaedic referral to Dr. Samuelson (Tr. at 115). Plaintiff was in a car accident on December 6, and he suffered a pneumothorax [collapsed lung], a pelvic fracture, and humerus [bone in the arm that runs from the shoulder to the elbow] and multiple rib fractures.

On July 9, 1999, plaintiff saw a doctor at Research Mental Health whose name is illegible, but the person has a Ph.D. (Tr. at 145). Plaintiff reported that his mood was not too bad. "Identified his resistance to homework and avoidance of behavioral interventions." The doctor told plaintiff he needs to work on his conversational skills to develop his interpersonal skills. He was told to ask three questions of his brother or mother to create a more meaningful conversation.

9

On July 23, 1999, plaintiff saw the same doctor at Research Mental Health with an illegible signature (Tr. at 144). Plaintiff reported excessive tiredness. He was worried about it being a side effect of his medication, and it was recommended he call his medication clinic (Dr. Day). "Discussed his ambivalence about his therapy work and difficulty acknowledging that he has various problems and can't fix them himself." The doctor agreed to be plaintiff's "social coach". He was assigned a GAF of 50[1].

On January 19, 2000, plaintiff saw Chester Day, M.D. (Tr. at 143). Plaintiff had not been to see Dr. Day since the previous June. He had been on Effexor (an antidepressant) but had been off that for the past three months. Plaintiff wanted to take himself off that medication to see how he would do, but his mood began to decrease and he felt increasingly uptight and anxious. Plaintiff said he would like to try something besides Effexor, even though he was not specific on any particular side effects or negatives that he had noted with Effexor.

_____

[1]A Global Assessment of Functioning of 41-50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

10

Dr. Day started plaintiff on Paxil[2]. "The implementation of counseling is also important and I would like to arrange for this as well. The previous experience he said was good but sometimes he became rather obsessional about the projects and exercises that were recommended to him."

On April 24, 2000, plaintiff saw Chester Day, M.D. (Tr. at 142). Plaintiff had gone off his Paxil because he thought it was making him tired, but then he hit a "low point" and got back on the medicine. The Trazodone[3] was "excellent" at helping him with his sleep pattern.

On June 1, 2000, plaintiff saw Chester Day, M.D. (Tr. at 141). Plaintiff complained of being tired and lethargic. He wondered if, since his car accident in December 1998, he had been getting enough oxygen. His lungs were collapsed when he was hit by a car. They were inflated gradually over a period of a month. His doctors had told him that his response to treatment was "really quite remarkable". Plaintiff reported that he tends to stay awake at night, but

---

[2]Paxil is a selective serotonin reuptake inhibitor (SSRI). Paxil affects chemicals in the brain that may become unbalanced and cause depression, panic, anxiety, or obsessive-compulsive symptoms.

[3]Trazodone is an antidepressant that also treats insomnia and other sleep disorders.

11

otherwise his mood was fairly good.  He did not believe his tiredness was related to his medication.  Plaintiff appeared to Dr. Day to be functioning fairly well.  He kept plaintiff on the same medicine and encouraged him to go to a doctor to have his pulmonary status evaluated.

On July 7, 2000, plaintiff was seen at Truman Medical Center for a growth on his arm (Tr. at 149-150).  He mentioned his broken ribs and collapsed lung from his car accident and said he has never quite felt the same.  He denied shortness of breath.  He reported he is a smoker.  He was told to stop smoking.

On July 18, 2000, plaintiff saw Robin Morris, M.D., at Truman Medical Center (Tr. at 152).  He complained of fatigue and occasional shortness of breath.  He requested a referral to a pulmonologist.  Plaintiff said he had been in a car accident in December 1998, and it took him six months to recover including three weeks in ICU.  He said he was told his lungs were punctured from his broken ribs and that his lung volume might be reduced.  He had an oxygen saturation of 98% and a normal ABG [arterial blood gas] per his report at a walk in clinic.  Plaintiff said he was an occasional smoker and that he drinks about once a week.  His only medication was Paxil, which he decreased himself.  He

12

said he gets a little bit of exercise when he mows the lawn,
but he does no concentrated cardiovascular exercise.
Plaintiff's exam was normal, including his lungs. Dr.
Morris assessed fatigue with occasional shortness of breath.
She scheduled pulmonary function tests. "We are going to
follow up with him in a few weeks after he has his PFTs
[pulmonary function tests] done and see if he does, indeed,
have any lung volume reduction according to those. If not,
then will probably presume that this is a psychological
issue and have him follow up with Dr. Day regarding possible
change in medication for fatigue possibly associated with
depression."

On August 1, 2000, plaintiff saw Robin Morris, M.D., at
Truman Medical Center (Tr. at 147). Dr. Morris reviewed
plaintiff's pulmonary function tests with him. He had
slightly restricted airways with some early small airway
obstruction and moderate restrictive disease. "I did
encourage him to begin some exercises and completely quit
smoking so that his lung disease will not progress any
further."

On August 3, 2000, plaintiff saw Chester Day, M.D. (Tr.
at 140). Plaintiff reported that he had some lung tests
recently and his oxygen saturation "seemed to be lower."

13

Plaintiff reported being tired from the Paxil. Dr. Day switched plaintiff to Prozac (an SSRI) since it would give plaintiff more energy.

On August 31, 2000, plaintiff saw Chester Day, M.D. (Tr. at 139). Plaintiff indicated he was doing OK. His Prozac was working better than the Paxil. He was taking Trazodone as needed for sleep. "He has switched to an evening job and is getting more sleep now, and his functioning appears to generally be better."

On October 5, 2000, plaintiff saw Jeffrey Scott, M.D., and complained of being very weak and shaky with some problems with depression and anxiety (Tr. at 115). "Patient was previously seen six months ago and blood work was done revealing no abnormalities." Dr. Scott performed a physical exam and found everything normal. He assessed malaise, depression vs. anxiety, and back pain. He continued plaintiff on Prozac 20 mg. twice a day, Xanax[4] 0.5 mg. three times a day as needed, and Daypro (a non-steroidal anti-inflammatory). Plaintiff was told to schedule physical therapy.

_____

[4]A benzodiazepine used to treat anxiety.

14

On October 12, 2000, plaintiff saw Chester Day, M.D. (Tr. at 138). Plaintiff reported that overall his mood was very stable. Plaintiff said the Prozac had been quite helpful. Trazodone had been helpful with his sleep disturbance. "[H]e notes he is much improved. He feels he can much better cope with the aggressive people in the world now that he has [illegible], he does not feel as overly sensitive as he was. He particularly notes that the Prozac has been very favorable".

On January 11, 2001, plaintiff saw Chester Day, M.D. (Tr. at 137). Plaintiff reported that things were about the same, overall his mood was a little better. Plaintiff was taking Prozac, Trazodone for sleep, and Ativan occasionally for anxiety. Dr. Day told plaintiff to increase his Prozac dosage because obsessive compulsive symptoms generally are more responsive to higher dosages of Prozac.

On February 14, 2001, plaintiff saw Chester Day, M.D. (Tr. at 136). Plaintiff reported that he cut back his Prozac. He was working part time as a stocker and he thought that was beneath him but at least he was employed. Plaintiff was continued on his medications, as Dr. Day found that "[o]verall, functioning appears to be fairly good".

15

On April 4, 2001, plaintiff saw Stephanie Hutchinson, a registered nurse in the office of Dr. Scott (Tr. at 115). He complained of fatigue and malaise over the past two to three weeks. "States the fatigue has impacted work, and he has decreased his work hours without relief." Plaintiff stated that he frequently feels nervous and anxious. He was taking Trazodone at bedtime. Ms. Hutchinson assessed persistent fatigue and malaise, depression and anxiety. Plaintiff was scheduled to see Dr. Chester Day later that week for evaluation of persistent depressive and anxiety related symptoms.

On May 9, 2001, plaintiff saw Victoria Burnett, APN (Tr. at 134-135). Plaintiff overslept and missed his morning appointment and rescheduled for later in the day. "He went on to say this is typically how he gets in trouble with his jobs, etc. He has difficulty getting up and keeping a schedule." Plaintiff reported having trouble with social anxiety and depression since he was in high school. He was currently working nights at Wal-Mart. His longest job was from 1989 to 1993, but then he overslept and was eventually let go. "We talked about possibly social security disability. He said he had never applied for that thinking people would think he was 'just a bum.' However,

16

we talked about it in terms of being able to get disability if indeed he is then motivated to go on and perhaps get a trade that would allow him to work in a setting where he did not have to interact with people and was not strenuous as far as his reduced lung capacity. He was excited about that possibility, and I think he is beginning to face the reality of his not being able to maintain a job in the every day workplace as most people are not going to accommodate him with his limitations." Ms. Burnett noted that plaintiff was able to control his stuttering fairly well. He had been living alone for the past ten years. He had adjusted to the Effexor and he noticed improvement with that medication.

On June 18, 2001, plaintiff saw Victoria Burnett, APN (Tr. at 132). Plaintiff reported that he is "able to cope with life." He said he was going to focus on school. He was working part time. Plaintiff's affect was brighter. Plaintiff was pleased with the effects of the Effexor, and he was continued on the same dose.

July 9, 2001, is plaintiff's alleged onset date.

On July 19, 2001, plaintiff saw Victoria Burnett, APN (Tr. at 131). Plaintiff was a bit late for his appointment. He reported that he quit his job at Wal-Mart because it had become more than he could manage, both physically and

emotionally. He had requested a transfer to a different position and they said they would transfer him, but it never happened. His left arm and his decreased lung capacity kept him from working. Plaintiff said he had thought about pursuing disability, but he had decided to put that on hold in the hopes that he would be able to get some training through vocational rehabilitation. Ms. Burnett noted that plaintiff's medications were keeping his mood stable and enabling plaintiff to improve his overall function, so no changes were made.

On September 12, 2001, plaintiff saw Victoria Burnett, APN (Tr. at 130). "He reports that he has been under a great deal of stress lately. This involves both having financial problems and as a result of that having to ask his dad to help him out financially and the two of them having a falling out. He said his dad does plan to now help him out some but he is very disappointed in him and that has an impact on the patient in that enumerated his siblings all being quite successful with Master's Degrees and professionals, and he sees himself at the age of 37 as being quite a failure. He also contacted vocational rehabilitation and while on the one hand indicated he could get services they have been very slow in coming across with

any type of concrete direction for the client to move. He
again is not working as he had both emotionally and
physically found the physical work too difficult or anything
that is not very fast pace. He is going to try to find
something part-time that would allow him to work slower and
not tax him physically due to his lack of lung capacity and
the damage he has to his left arm. He is again planning to
attend school in a part-time capacity when he can get that
arranged. He was encouraged to apply for social security
disability and he is again considering that. He indicates
he is sleeping fine with the Trazodone."

On October 16, 2001, plaintiff saw Victoria Burnett,
APN (Tr. at 129). Plaintiff stated that he still had not
been able to locate a job, and he said "that is in part due
to the fact that he knows he does not present very well
because he himself does not feel he could handle most jobs.
He talked more today about his obsessive compulsive disorder
and said he tries to hide this from people because he knows
it is seen as 'weird,' but he said it does help he feels to
channel some of his anxiety. He describes having a feeling
of being obsessed with geometric shapes. He will count the
number of edges or angles on objects and this can take a
great deal of his energy and his attention and he is easily

19

distracted from whatever he is supposed to do by the
compulsion to carry out these activities.  He also said
grooming takes a great deal of time.  He continues to check
and recheck his hair working very diligently to cover any
bald spots.  He said if it does not go the way he wants he
becomes easily frustrated.  He has been known to throw
objects, and he said this he thinks does interfere when he
applies for jobs because he becomes very anxious in the
initial interviewing process because he is already worried
about what if he gets the job and then he cannot handle it
because of the need to count and constantly be checking."
Ms. Burnett discussed plaintiff's situation with Dr. Day who
decided not to make any changes to plaintiff's medication.

On December 10, 2001, plaintiff saw Victoria Burnett,
APN (Tr. at 133).  Plaintiff ran out of his medication and
was not able to buy any more.  Plaintiff started to feel bad
again, "although he had been thinking he would like to
eliminate as much medications from his regime as possible.
We did discuss this at length and also the possibility of
switching from Effexor to Zoloft.  He has, however,
'researched' the SSRIs[5] and he would prefer not to be on an

---

[5]Selective serotonin reuptake inhibitor, used to treat
depression and anxiety.

SSRI.  He is again concerned about some of the possible long-term effects of the medication, although at this point he could not name any that he is aware of."  Plaintiff's Effexor dosage was decreased.  "He said that he overslept and lost yet another job.  This one was as a stocker working nights at Kmart.  He said that he has repeatedly lost jobs both due to his inability to concentrate and attend to the position as well as his inability to be consistent showing up for work."

On February 11, 2002, plaintiff saw Victoria Burnett, APN (Tr. at 128).  "I'm trying to make a decision re: voc[ational] rehab[ilitation], supported work effort, and disability."  The remainder of the record is illegible.

On March 26, 2002, plaintiff saw Victoria Burnett, APN (Tr. at 126).  Plaintiff stated that one night he felt stir crazy and anxious, he fell into old habits and got a DUI.  "I've had them before and I'm looking at hard time.  I need a treatment program."  Ms. Burnett observed that plaintiff was alert, attentive, anxious, restless, fidgety.  She assessed alcohol abuse and recommended a treatment program.

Plaintiff participated in inpatient alcohol abuse treatment from April 9, 2002, through May 8, 2002, at Mainstream Kansas City (Tr. at 160-165).  Plaintiff reported

21

that he had been drinking for many years and had received

five DUIs, "one of them in March". "He hired a lawyer who

recommended he seek treatment". Plaintiff was fired from

his last job and his father helped him pay for the treatment

program. Portions of plaintiff's discharge summary appear

below:

> <u>Presenting Problem</u>: Doug has been diagnosed [with]
> alcohol dependence, generalized anxiety disorder. He
> is unemployed and has financial problems due to his
> alcohol use. He lacks a social life without the use of
> alcohol. Relapse prone. Low self esteem.

> <u>Course of Treatment</u>: Doug completed 30 days of
> residential treatment. He participated in substance
> abuse educational groups (10 hrs weekly), group therapy
> (10 hrs. weekly), individual therapy (once weekly) and
> 12 step community AA/NA meetings (5 hrs weekly). He
> explored the first three steps of the 12-step recovery
> program and discussed the negative consequences that
> have resulted from his relationship with substances
> including the effects on his legal, employment, family
> and emotional issues. He received a psychiatric
> evaluation to determine any diagnosis that needed to be
> addressed and that may impede the patient's recovery
> from chemical dependency. . . .

> <u>Results</u>: Doug has successfully completed treatment.
> He participated in all aspects of treatment. Doug
> identified his personal relapse triggers and the
> alternatives for each of them. . . . Doug has
> identified his own consequences as well as the
> potential consequences if he continues to use alcohol
> and drugs. Doug has learned new coping skills for
> dealing with anger and stress. . . .

> <u>Prognosis</u>: Good if he will continue the program of
> recovery he has started while in treatment.

Diagnosis upon discharge and recommendations for
further treatment:  It is recommended he abstains from
alcohol use and continues to take his medicines that
were prescribed by the doctor.  He will attend daily 12
step meetings at Grassroots in Grandview Mo. until he
becomes employed then at the minimum 3 times a week.
Also attend social functions at least one time a week
where alcohol is not served.

Axis I:    Alcohol dependence
           MDD [major depressive disorder]
           Generalized anxiety disorder
Axis II:   Obsessive compulsive personality disorder
Axis III:  No diagnosis
Axis IV:   Unemployment
           Financial problems
Axis V:    Current GAF 55[6]

The discharge summary was signed by Ernest Hale,

Primary Counselor.

On April 30, 2002, plaintiff filed his application for

disability benefits while he was in inpatient alcohol abuse

treatment.

On May 8, 2002, plaintiff saw Victoria Burnett, APN

(Tr. at 125).  "I spent 30 days at Main Stream - I just got

out this morning.  I've been to my 1st AA meeting this noon.

I've learned a lot.  I did get and still am real [illegible]

and bummed out.  The psychiatrist there increased the

_____

[6]A Global Assessment of Functioning of 51-60 means
moderate symptoms (e.g., flat affect and circumstantial
speech, occasional panic attacks) or moderate difficulty in
social, occupational, or school functioning (e.g., few
friends, conflicts with peers or co-workers).

23

Effexor [an antidepressant] but I didn't fill it yet, I was having these jerking spells. Have a driving permit." Ms. Burnett observed that plaintiff was alert, attentive, interactive, his speech was coherent and relevant, volume & rate within normal limits. No evidence of thought disorder, no delusions, no hallucinations. Affect full, mood was anxious and depressed. Plan: "decrease Effexor, start Paxil, continue AA daily, secure employment at Toys R Us".

On May 20, 2002, plaintiff saw Victoria Burnett, APN (Tr. at 124). He stated that he had had one drink on two occasions, "that's not a big deal". Plaintiff was still waiting for a court date. He reported that he went to work at Toys R Us. Most of this record is illegible. I can make out "when confronted with alcohol use".

On June 26, 2002, plaintiff was seen by Gary C. Horner, Ph.D., a psychologist, at the request of Disability Determinations (Tr. at 166-168). Portions of Dr. Horner's report are as follows:

> MEDICATION AT CONSULTATION: Wellbutrin [an antidepressant] 100 mg. daily, Paxil 12.5 mg daily, Trazodone 50 mg. h.s. [at bedtime] prn [as needed], Lorazepam[7] prn [as needed]. Client did not bring to appointment. Medications prescribed by nurse practitioner at local mental health center.

---

[7]A benzodiazepine used to treat anxiety or insomnia.

MENTAL STATUS: Mr. Horn is a 37 year old never married man with no children. He lives alone in a single family residence. He drove himself alone to this appointment and these results are thought to be representative of his current functioning. . . . He was appropriately dressed in seasonal casual clothing and he was clean and groomed. His general activity level was tense through out the hour interview. He was cooperative. His speech showed average volume, rate and inflection. Quantity of speech was average. He had a very occasional stutter. . . . Attention and concentration . . . were good to fair. Memory for recent events was average. . . . Memory for distant events was average. Intellectual functioning is estimated to be in the broad average range. Judgment and insight are fair. Social skills are adequate to weak due to anxiety. Eye contact is good to fair. Motor skills are good. . . . He reports moderate paranoid thoughts related to people in positions of power making fun of him and police paying more attention to him than others. He denies current use of alcohol. Asked if it was ever a problem, he said it was a help and not a problem. Despite that, he was in a 28 day detox/treatment program in March 2002. He denies past and present use of marijuana. He denies current use of cocaine/methamphetamines. He said these were a problem about a year ago. He has been arrested three times for DWI. He served "two days shock time" in 1994 and his most recent DWI was March 2002. . . . He has a valid driver's license and drives without difficulty.

RELEVANT HISTORY: Mr. Horn reports he is disabled due to combination of physical and mental problems. He has only 50% of normal lung capacity as [a] result of injuries suffered in a pedestrian/vehicle accident and he has a steel rod in his shoulder. He has been taking most of the above medications about a month. He has been working with the local mental health center for four years. He sees the prescribing nurse once a month. He is not receiving any other mental health services at this time. Asked if he thinks he needs other mental health services, he said he wants to focus on his medications "as a first step". He said he has told the prescriber he is frustrated with her and he

25

said he plans to tell her that again. . . .

He reports depression is a large[r] problem than
anxiety.  Asked about symptoms of depression, he
spontaneously reports he gets "spaced out, for lack of
a better word". . . .  [H]e said he does not have
crying spells.  Asked about appetite, he said he snacks
a lot.  His bedtime is around midnight to 2:00 a.m.
Without sleep meds, he can't get to sleep so he gets
back up and watches TV and snacks and then goes to
sleep a couple of hours later.  He then has trouble
staying asleep, but does not know what wakes him up.
He then has trouble going back to sleep.  He gets up
between 8:00 and 10:00 a.m.  He estimates he gets about
four hours of sleep.  He then takes a couple of daytime
naps for an hour each.  With sleep meds he goes to
sleep within an hour and remains asleep.  He gets up
around 9:00 a.m. and estimates he gets a total of 7
hours of sleep.  He takes one daytime nap of an hour.
He has six relatives and four friends he talks to at
least once a week. . . .  He has hobbies of working on
his "hobby car" and restoring old bicycles.  He bathes,
dresses and brushes hair and teeth daily.

. . .  In response to questions about anxiety, he has
never visited hospital emergency rooms due to anxiety.
. . .

His large time consumers are "trying to get going and
getting ready (shower, dressed, etc.)", watching TV and
doing things on his computer. . . .

FINDINGS:  This client is able to understand and
remember detailed and simple instructions.  He is able
to sustain concentration and persistence with detailed
and simple tasks.  His ability to relate socially may
be his most limiting factor.  He is able to adapt to
changes in his social environment.  He is able to
manage funds as long as he refrains from substance use.

DIAGNOSIS:
Axis I:   Obsessive compulsive disorder
          Polysubstance abuse/dependence in recent
          remission with depressed mood

26

Dyssomnia[8] NOS [not otherwise specified]
                    Probable social phobia
         Axis II:   Personality disorder, NOS [not otherwise
                    specified]
                              * * * * *
         Axis IV:   Part time employment, inadequate finances
         Axis V:    Current GAF 50-55, highest past year 55[9]

    On July 8, 2002, plaintiff saw Victoria Burnett, APN

(Tr. at 123).  Plaintiff said he felt lost and confused, "I

don't know if Wellbutrin is what I need.  I think I probably

need both [illegible] and [illegible]."  Ms. Burnett noted

that plaintiff was alert, attentive, and interactive.  His

speech was coherent and relevant.  There was no evidence of

thought disorders, no delusions, no hallucinations.  He

lacks support from his family, he denied alcohol use.  She

noted that plaintiff continued to have resistence to taking

medication.  He was working nine to 12 hours per week

assembling bikes.  Plaintiff's medication was not changed,

he was instructed to return in two months.

    On July 22, 2002, Kathleen King, Ph.D., completed a

Psychiatric Review Technique (Tr. at 169-182).  Dr. King

found that plaintiff's mental impairment is not severe.  She

_____

        [8]A group of disorders characterized by difficulty in
going to sleep or staying asleep or excessive daytime
sleepiness.

        [9]A Global Assessment of Functioning of 51-60 means
moderate symptoms.

                              27

found that he suffers from anxiety-related disorders, personality disorders, and substance addiction disorders. His anxiety-related disorders stem from obsessive compulsive disorder, probable social phobia, and dyssomnia per consultative examiner's diagnosis. She found that if plaintiff complies with treatment and abstains from drugs and alcohol, he has no restriction of activities of daily living; mild difficulties in maintaining social functioning; and no difficulties in maintaining concentration, persistence, or pace. "Claimant's psychological symptoms do not appear severe enough to prevent him from performing a wide variety of tasks."

On September 6, 2002, plaintiff saw M. Azher Mirza, M.D. (Tr. at 122). The first few sentences of this record are illegible. "We discussed about the financial issues and stressors. He quit the job because he could not handle a person he was working with. The patient has a problem with moderate depression. He had a major problem with obsessive compulsive behavior. He is psychosomatic. The patient needs to read in between the lines and look into the side effects of the medicine. He is so much focused on slight affect on medicine that he is not being adequately treated. That patient was confronted and educated. He was informed

28

that if he is not getting proper dose of medicine we are not going to treat his condition very well. He will be always miserable. We also discussed we have to go to a good dose because of severe Obsessive Compulsive Disorder problems." Dr. Mirza prescribed Zoloft, gradually increasing from 50 mg. to 100 mg.

On October 18, 2002, plaintiff saw M. Azher Mirza, M.D. (Tr. at 121). Plaintiff complained of having twitching, jerky movements. He felt obsessed about things. He said he spends an hour "just grooming my hair and taking a shower." Dr. Mirza observed that plaintiff had some mild stuttering and was having some difficulty with obsessive compulsive disorder. Dr. Mirza told plaintiff to continue his Zoloft, he prescribed Risperdal for helping with organized thinking and reducing the stuttering.

On December 11, 2002, plaintiff saw M. Azher Mirza, M.D. (Tr. at 120). He reported that he was still nervous and anxious, he had difficulty concentrating, he has obsessive thinking. Plaintiff said that the Risperdal was helping him some, but he was having twitching. He had cut down on the Zoloft. "He is nervous and anxious. He is having difficulty coping with things. The patient is not working. His stuttering looks better. He is verbal. He

29

continues to be obsessive." Dr. Mirza found that plaintiff
was partially stabilized. He continued plaintiff's Zoloft
and Risperdal. "He is applying for disability."

On January 07, 2003, plaintiff saw Edna Hamera, a
psychiatric nurse (Tr. at 119). "The client lives alone in
a house. He is on probation and has been told he needs to
find a job. Presently, the client is being helped
financially by his father. The client had a DUI one year
ago and he presently has no transportation because he does
not have a license. The client is eating two to three meals
per day. He drinks six to eight cups of caffeine and has
beer, three times per week, with a friend." Ms. Hamera
noted that plaintiff appeared sad and his affect was
restricted. Plaintiff was told to continue taking Zoloft
but to take it in the morning rather that at bedtime. He
was given a voucher for Trazodone as he had run out of that
medication. "The precautions of taking a Benzodiazepines
and drinking were reiterated and he was also told his chance
of relapsing into alcohol problems with Ativan was also
related."

On May 20, 2003, Edna Hamera, a psychiatric nurse
practitioner, wrote a letter to whom it may concern (Tr. at

195-196).  She stated that she had seen plaintiff three times since January 21, 2003.

> Mr. Horn has difficulty working full-time.  He has long-term psychiatric disability since the age of 14 or 15 when he has obsessive compulsive disorder.  The client's psychiatric problems have been further exacerbated by a motor vehicle accident in 1998.  Since that time, he has shown symptoms of major depression. The client has diminished capacity from the motor vehicle accident.
>
> The client has been able to sustain part-time work sporadically, that is at six hours or less per day, when he is in a low stimulating environment with few people and nonstressful job.  The client clearly has difficulty working since 1998 and has only been able to sustain intermittent part-time employment since July 9, 2001. . . .  In addition, the client has problems with concentration.  In the past, the client has resorted to alcohol to diminish his signs and symptoms but he has had this under control for the past six months.
>
> In summary, the client does have impairment with his psychiatric condition of obsessive compulsive disorder and major depression and is capable of only part-time work.

That same day, Ms. Hamera completed a Mental Residual Functional Capacity Assessment (Tr. at 197-199).  She found plaintiff markedly limited in his ability to maintain attention and concentration for extended periods, his ability to complete a normal workday, his ability to interact appropriately with the general public, and his ability to get along with others.  When asked to explain the clinical observations and tests used in making the above

31

determinations, Ms. Hamera simply repeated plaintiff's symptoms and her findings: "very anxious & has difficulty remembering complex instructions and being around others. Able to stay focused only about 6 hr/day, needs a nonstressful environment."

On June 18, 2004, plaintiff was evaluated at Pathways Community Behavioral Health (Tr. at 211-213).

On July 13, 2004, plaintiff saw Edna Hamera, a nurse practitioner (Tr. at 206). Plaintiff reported he had been doing fairly well. He had been attending work. "He does have some problems with two women that work there and he thinks they tease and make fun of him. that makes him more anxious." Plaintiff was more nervous this day because he did not take his Trazodone the night before. He said he attends AA when he can. He must rely on his mother to drive him around as he cannot get his license reinstated until March 2005. Plaintiff was well groomed, casually dressed, and he maintained good eye contact. He smiled occasionally and shared a sense of humor. Ms. Hamera assessed a GAF of 55 (moderate symptoms).

On September 3, 2004, Carol Bell, a counselor at Pathways Community Behavioral Healthcare, wrote a letter to whom it may concern (Tr. at 210). Plaintiff received a

32

drug/alcohol assessment on June 18, 2004, due to having a
DWI and being placed on probation.  He is working on
learning relapse prevention skills.  He had completed intake
and four therapy sessions.

On November 26, 2004, the ALJ entered his opinion
finding plaintiff not disabled.

On March 21, 2005[10], plaintiff saw Alan Israel, Ph.D.,
a certified psychologist (Tr. at 215-217).  Portions of Dr.
Israel's report are as follows:

> . . .  He states he lives alone and feels that he needs
> the peace and solitude of such. . . .
>
> The client states that he's been in jail several times
> for alcohol-related offenses.  He indicates that he
> feels that he drank in order to "feel more normal".  He
> states he also went to A.A. meetings.  He states that
> the present time he does not have a driver's license
> and will not be eligible to get one again for another
> month.
>
> The client states he works part-time at U.S. Toys as an
> order-filler.  When asked how he liked the job he gave
> a confusing answer about how the female supervisors
> like more traditional people and he is not traditional.
> He indicates that he finds that he cannot handle full-
> time work because "it's too stressful."  He has not
> worked full-time since 2000 when he was a machinist.
>
> The client states that he took the years of 1999 to
> 2000 off because he was involved in an automobile

---

[10]Plaintiff was seen by Dr. Israel five months after
the ALJ entered his opinion finding plaintiff not disabled.
This evidence was submitted to the Appeals Council who
reviewed the new evidence but denied review.

accident.  He states he wanted to get some rest. . . .

The client states that he has one friend.  He speaks to
the friend on the telephone.  He states he bought a
fix-up house and he spends his time trying to do
projects on the house. . . .

. . .  His motor activity is within the normal range.
His speech is controlling.  He had a strong need to
have a highly focused structured interview and respond
specifically in chronological order.  This is
consistent with his obsessive-compulsive disorder.

His flow of thought shows no blocking, circumstantial
or tangential thought processes, flight of ideas, loose
associations, or indecisiveness.  His mood during the
exam reflects significant anxiety.  His interview
behavior was cooperative but structured.  He denies
present suicidal thoughts and plans.  He denies
hallucination and delusions.  He admits to being
obsessive, anxious and having discomfort in social
situations.

On the Mini Mental State Exam the client was oriented
in all spheres.  He had no difficulty reading or
writing, remembering three words for 10 minutes, or
following a 3-stage command.  He seemed to enjoy the
Mini Mental State Exam since it gave him the
opportunity to answer very structured questions.

Diagnostically, this individual does show the
following:
Axis I
-- Obsessive-Compulsive Disorder
-- Social Phobia
Axis II
-- None
Axis III
-- Complaints of problems with his left arm
Axis IV
-- Desire to continue medication attention

34

Axis V
-- GAF present 45[11]

This client's only area of normality is working 20 hours a week.  However, he cannot work more hours because of his discomfort.  He tends to stay alone, repeat tasks, and have an extremely difficult time with other people.  Although he states that once he gets his license back he will re-involve himself in A.A. and other organizations it is highly unlikely that he will do this.

On May 18, 2005[12], Azher Mirza, M.D., wrote a letter to whom it may concern (Tr. at 214).  Dr. Mirza, a senior psychiatrist, had been seeing plaintiff for three to four months and previously saw him in 2003.  "He has been suffering from a chronic condition of major depressive disorder, recurrent, moderate; and moderate obsessive-compulsive disorder.  The patient is anxious, has difficulty with irritability, and he has a lot of difficulty dealing with stress.  In view of his condition and chronicity, in my opinion Mr. Horn is unable to work full-time at any job."

_____

[11]A Global Assessment of Functioning of 41-50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

[12]This was written by Dr. Mirza six months after the ALJ entered his opinion finding plaintiff not disabled. This new evidence was considered by the Appeals Council, who then denied review.

35

*C.* ***SUMMARY OF TESTIMONY***

During the September 2, 2004, hearing, plaintiff testified; and Janice Hastert, a vocational expert, testified at the request of the ALJ.

**1.   Plaintiff's testimony.**

Plaintiff sees Edna Hamera, a nurse practitioner, for medication, and he sees a counselor at Pathways twice a month (Tr. at 222).  At the time of the hearing, plaintiff was 39 years of age (Tr. at 226).  He has a GED and earned that in 1983 (Tr. at 226).  Plaintiff has a mild stutter (Tr. at 226).

Plaintiff previously worked as a machinist, but he was not a journeyman (Tr. at 227-228).  To become a journeyman, you have to participate in a four-year program, and he has never held a job long enough to get one of those programs going (Tr. at 228).  Plaintiff also worked as a stocker, where his duties were to replenish the shelves at night (Tr. at 229).

Plaintiff's alleged onset date, July 9, 2001, is the day he quit his 32-hours-per-week job (Tr. at 229). Plaintiff has been worked part time since 2003 (Tr. at 230). He fills orders at a warehouse (Tr. at 230).  He goes through the warehouse, collects things from bins, places the

36

items for the order in a box, and it is shipped to stores throughout the country (Tr. at 230). He then replenishes the bins in the warehouse (Tr. at 230-231). Plaintiff mostly works with plastic toys (Tr. at 231). Plaintiff started this job working full time, but he was exhausted and was missing work from being exhausted, so he requested that his hours be reduced to 20 per week (Tr. at 231). Also, he was on probation and he has to have a job as a condition of his probation (Tr. at 232). Plaintiff was convicted of DUI, and his probation was set to expire sometime in 2006 (Tr. at 232).

Plaintiff has lost jobs in the past due to feeling overwhelmed physically and emotionally, and he is afraid to work more than 20 hours a week because he gets "totally burned out" (Tr. at 233). Plaintiff has always felt anxious, but it got worse after his accident (Tr. at 234).

Plaintiff had held his current part time job since February 2003 (one year and seven months) (Tr. at 235). He is having problems with two assistant managers, and he believes he is being judged on his social and emotional facade rather than solely on his performance (Tr. at 235). Before this job, he worked at Toys R Us for three months (Tr. at 235). He started a fight with coworkers, and

37

because it was an awkward situation, he quit (Tr. at 236).
Plaintiff worked full time at K-Mart and was fired because
he overslept too many times (Tr. at 236). Plaintiff was
fired from his job at Wal-Mart because although his boss
told him he could not have a day off for vacation, he took
the day off anyway (Tr. at 236).

Plaintiff was fired from his job at ROM Corporation for
oversleeping (Tr. at 236). He was fired from a job at
Central Manufacturing because he could not "snap out" of his
depression (Tr. at 237). He worked at Turex Cranes and
although he was able to handle that job, he got laid off
from that one (Tr. at 237). He experienced a lot of back-
stabbing with coworkers at that job though (Tr. at 237). He
was fired from Grand Coe for oversleeping, and Nutech
Industries fired him but he does not know why (Tr. at 238).
Plaintiff was having no problems or conflicts on that job
(Tr. at 238).

Plaintiff worked nights for three and a half years at
Puritan Bennett, then they switched him to days where he had
to be at work at 5:00 a.m. (Tr. at 238). He overslept too
many times and was fired (Tr. at 238).

Plaintiff believes he was having trouble oversleeping
because his anti-depressants have a sedative effect, but

38

he's not actually sure if that's the cause (Tr. at 239).

Plaintiff currently works from 6:00 p.m. until 10:00 p.m. (Tr. at 239). After work, he goes home and winds down for an hour and then goes to sleep (Tr. at 239). He gets up around 9:00 a.m. (Tr. at 239-240). Plaintiff lives by himself in a house (Tr. at 240). He spends his day doing chores around the house, and he is trying to teach himself some computer skills (Tr. at 240). He naps for about an hour before he goes to work (Tr. at 240). Plaintiff thinks he has been able to handle this job because he has enough down time so that he does not feel overstressed (Tr. at 240). He believes if he even worked a few more hours per month, he would get stressed out and get fired (Tr. at 241).

Plaintiff testified that he has a long history of alcohol abuse (Tr. at 241). He was asked if he ever had a problem with abusing other drugs that are nonprescription, and he said, "no"[13] (Tr. at 241). He has been in several treatment facilities, "as a means to stay out of prison" (Tr. at 241). He does not really like alcohol, he uses it as a means to kill the anxiety and the obsessive compulsive habits (Tr. at 241). He said it works quite well at killing

---

[13]However, he told Dr. Horner in June 2002 that he had a problem with cocaine and methamphetamine in 2001.

39

the anxiety and reducing the obsessive compulsive habits for a short while (Tr. at 241). The longest time plaintiff has gone without using alcohol was a year from 2002 to 2003 (Tr. at 242).

Plaintiff's mother helps him with transportation since he lost his license (Tr. at 242). She also helps him financially, but she is on a fixed income now and has told him that she cannot help him out anymore (Tr. at 242). Plaintiff does not do many activities -- he said he is pretty much isolated "because of the transportation issue" (Tr. at 242-243).

Although plaintiff talked about trying to go to school or go through vocational rehabilitation, he has not done that because he has not had the money or the time (Tr. at 243). When he gets his license back, he may try to go to school part time (Tr. at 243).

## 2. Vocational expert testimony.

Vocational expert Janice Hastert testified at the request of the Administrative Law Judge. Ms. Hastert testified that the order filler job plaintiff currently has is a DOT code 922.687-058 (Tr. at 246). It is a medium semi-skilled job (Tr. at 246).

40

The first hypothetical was as follows:  The person has no exertional limitations but would be restricted to simple, repetitive tasks, low stress work, and little contact with others (Tr. at 246-247).  The vocational expert testified that the order-filler job would be "ideal" (Tr. at 247). There are 2,400 jobs in the State of Kansas, 1,000 jobs in the Kansas City area, and 190,000 jobs in the nation (Tr. at 247).

The second hypothetical added the following limitation to the first hypothetical:  the person has a ten to 20 percent diminishment of the ability to maintain a schedule (Tr. at 247).  The vocational expert testified that such a person would not be able to work full-time (Tr. at 248).

**V.   *FINDINGS OF THE ALJ***

At step one of the sequential analysis, the ALJ found that plaintiff had been working 20 hours a week as an order filler (Tr. at 22).  Plaintiff does not believe he can work full time, but he is required to work as a condition of his probation (Tr. at 22).  The ALJ found that, based on plaintiff's earnings of $650 to $800 per month, he is not engaged in substantial gainful activity; although the fact that he is engaging in this part time work activity undermines his allegations of disability (Tr. at 22).

41

At step two of the sequential analysis, the ALJ found that plaintiff suffers from major depression and obsessive compulsive disorder, both of which are severe impairments (Tr. at 22). He found that plaintiff's restrictive lung disease is not a severe impairment (Tr. at 22).

At step three, the ALJ found that plaintiff's severe impairments do not meet or equal a listed impairment (Tr. at 22).

At the fourth step of the sequential analysis, the ALJ found that plaintiff has no exertional or nonexertional limitations, but mentally is limited to simple repetitive tasks with low stress and limited contact with others (Tr. at 23, 24, 25). With this residual functional capacity, plaintiff is unable to return to his past jobs as a machinist or stocker (Tr. at 25).

The vocational expert testified that a person with plaintiff's residual functional capacity could perform the job of order filler, with 1,000 jobs in the Kansas City area and 140,000 jobs in the nation (Tr. at 25-26). At the fifth step of the sequential analysis, the ALJ found that plaintiff is capable of performing the job of order filler on a full-time basis, and therefore is not disabled (Tr. at 26).

## VI. WEIGHT GIVEN TO STATE AGENCY MEDICAL CONSULTANT

Plaintiff argues that the ALJ erred in failing to explain why he rejected the opinion of the state agency medical consultant that plaintiff should avoid all exposure to fumes, odors, dusts, gases, and poor ventilation. The report to which plaintiff cites was prepared by a non-physician employee of Disability Determinations, Melissa Sinkhow[14]. Ms. Sinkhow recommended that plaintiff avoid all exposure to fumes, odors, dusts, gases, and poor ventilation based solely on his pulmonary function tests in August 2000. "At the time it was recommended that he quit smoking. It is unclear if he was able to do this or not. His current PFT's [pulmonary function tests] from 08/05/02 show only moderate changes from the PFT's from a year ago. He takes no medication for this impairment." (Tr. at 192).

Therefore, even though plaintiff's treating physicians never made any recommendations to him regarding his pulmonary function, other than to stop smoking, this non-physician reviewer recommended extreme limitations based on the same tests.

---

[14]Her signature is somewhat illegible and I have guessed at the spelling of her last name.

43

Because Ms. Sinkhow is not a physician, her opinion is not one from an "acceptable medical source," and is therefore not entitled to the same weight as an opinion from a treating physician. See 20 C.F.R. §§ 404.1513(a), 404.1513(d), 416.913(a), 416.913(d). Instead, the regulations and the case law provide the ALJ with discretion to reject such "other source" evidence based on inconsistencies in the record. See Raney v. Barnhart, 396 F.3d 1007, 1010 (8th Cir. 2005); Shontos v. Barnhart, 328 F.3d 418, 426 (8th Cir. 2003).

As mentioned above, Ms. Sinkhow's opinion is not consistent with the opinion of the doctors who treated plaintiff and is not consistent with the other evidence in the record. On July 7, 2000, plaintiff denied shortness of breath (Tr. at 149-150). On July 18, 2000, plaintiff had an oxygen saturation of 98% and a normal arterial blood gas (Tr. at 152). Plaintiff's physical exam was normal, including his lungs. On August 1, 2000, after his pulmonary function tests, Dr. Morris told plaintiff to exercise and stop smoking (Tr. at 147). Plaintiff was never treated for any pulmonary disability, he was never on any medication for this impairment, and indeed he only told one person, Victoria Burnett (a nurse) that he quit his job at Wal-Mart

44

in part because of his left arm and his decreased lung capacity. However, at the hearing, he testified that he lost his job at Wal-Mart for taking unauthorized vacation, not because of his shoulder and decreased lung capacity as he had said to Ms. Burnett. Plaintiff never complained of problems with fumes, odors, dusts, gases, or poor ventilation to any doctor.

Plaintiff testified that he is afraid to work more than 20 hours per week because he gets "totally burned out". Plaintiff lost one job because he started a fight with co-workers and lost most of his other jobs due to oversleeping. Plaintiff has never alleged that he has trouble working due to problems with fumes, odors, dusts, gases, or poor ventilation, and he testified that he is unable to work full time due to his mental impairment, not because of exposure to these irritants.

Finally, even if plaintiff's argument had merit, it would make no difference. The ALJ found that plaintiff was not disabled because he can perform the job of order filler, a job which, according to the Dictionary of Occupational Titles, does not require any exposure to these environmental conditions. See D.O.T. 922.687-058.

45

In his reply brief, plaintiff raises the Psychiatric Review Technique completed by Dr. King, and argues that the ALJ failed to discuss this report. This argument is also without merit. Dr. King found, as plaintiff states in his reply, that plaintiff suffers from "mild difficulties in maintaining social functioning." The ALJ actually found that plaintiff suffers from moderate difficulties in maintaining social functioning, a greater restriction than that found by Dr. King. Therefore, it can hardly be said that the ALJ "ignored" the opinion of Dr. King.

Based on the above, plaintiff's motion for summary judgment on the ground that the ALJ failed to explain the weight given to the opinions of the state agency medical consultants will be denied.

## VII. FULLY AND FAIRLY DEVELOP THE RECORD

Next, plaintiff argues that the ALJ erred in failing to fully and fairly develop the record. Specifically, plaintiff claims that the ALJ relied partially on the fact that plaintiff did not take any medication for his lung problem when the record at page 185 says plaintiff used Albuterol. Page 185 is a record pertaining to a pulmonary function test which states that plaintiff was given Albuterol during the pulmonary function test. There is no

46

evidence that plaintiff was ever prescribed Albuterol, he never listed it as a medication he was prescribed or was taking in any medical record or in any administrative record dealing with his disability application.

Plaintiff's motion for summary judgment on this basis will be denied.

### VIII. OPINIONS OF DR. MIRZA AND DR. ISRAEL

Finally, plaintiff argues that the Appeals Council erred in failing to consider and evaluate the opinions of Dr. Mirza and Dr. Israel.

Once it is clear that the Appeals Council has considered newly-submitted evidence but denied review, the Court's role on review is limited to deciding whether the ALJ's decision is supported by substantial evidence on the record as a whole, including any evidence submitted after the ALJ's determination was made. Stephens v. Shalala, 50 F.3d 538, 541 (8th Cir. 1995); Riley v. Shalala, 18 F.3d 619, 622 (8th Cir. 1994).

The ALJ entered his opinion on November 26, 2004. Dr. Israel saw plaintiff on March 21, 2005, and diagnosed obsessive-compulsive disorder and social phobia (not depression and anxiety). Plaintiff's GAF was 45, lower than it had been at any time prior to the ALJ's opinion. Dr.

Israel found that plaintiff could not work more than 20 hours per week "because of his discomfort."

Dr. Mirza wrote a letter to whom it may concern on May 18, 2005. Dr. Mirza had been seeing plaintiff for the past three or four months (<u>after</u> the ALJ's opinion) and found that plaintiff could not work full time because he suffers from major depressive disorder, recurrent, moderate; and moderate obsessive-compulsive disorder. Dr. Mirza found that plaintiff was anxious, he had difficulty with irritability, and he had a lot of difficulty dealing with stress. None of Dr. Mirza's treatment records were provided[15].

Both the opinion of Dr. Israel and the opinion of Dr. Mirza are based on plaintiff's condition after the ALJ's decision. Dr. Israel did not see plaintiff until four months after the ALJ's opinion, and nearly seven months after the administrative hearing. Dr. Mirza did not begin seeing plaintiff again until after the ALJ's opinion and had not seen plaintiff for more than two years. Evidence

---

[15]Dr. Mirza saw plaintiff three times in late 2002, and those records are included; however, plaintiff resumed treatment with Dr. Mirza in 2005 after the ALJ found plaintiff not disabled, and none of those records were provided to the Appeals Council along with Dr. Mirza's letter.

48

obtained after an ALJ's decision is material only if it relates to the claimant's condition on or before the date of the ALJ's decision. Goad v. Shalala, 7 F.3d 1397, 1398 (8th Cir. 1993). Plaintiff's recourse is to file a new application for benefits based on his deteriorated condition after the ALJ's opinion. 20 C.F.R. § 404.620; Jones v. Callahan, 122 F.3d 1148, 1154 (8th Cir. 1997).

I note, however, that the opinions are not inconsistent with the ALJ's findings. The ALJ limited plaintiff to performing only low-stress work activities involving simple or repetitive tasks with limited contact with others. Plaintiff's irritability or difficulty dealing with stress was taken into consideration by the ALJ in forming this residual functional capacity.

## IX. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

49

ORDERED that the decision of the Commissioner is

affirmed.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
January 8, 2007

Case 4:06-cv-00152-REL   Document 13   Filed 01/09/07   Page 50 of 50